**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MICHAEL H. HOLLAND; MARTY D.
HUDSON; THOMAS F. CONNORS;
ROBERT T. WALLACE, as Trustees of
the Plaintiff United Mine Workers
of America 1992 Benefit Plan;
UNITED MINE WORKERS OF AMERICA
1992 BENEFIT PLAN,
<u>Plaintiffs-Appellees,</u>

UNITED STATES OF AMERICA,

No. 96-1262

<u>Intervenor,</u>

v.

KEENAN TRUCKING COMPANY, a
corporation; EASTERN ENERGY
INVESTMENTS, a corporation; CEDAR
TRUCKING COMPANY, a corporation;
DARRELL KEENAN, individually,
<u>Defendants-Appellants.</u>

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Dennis Raymond Knapp, Senior District Judge.
(CA-93-1223)

Argued: October 29, 1996

Decided: December 17, 1996

Before WILKINSON, Chief Judge, and WIDENER and WILKINS,
Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Widener and Judge Wilkins joined.

_____

**COUNSEL**

**ARGUED:** Walter Scott Evans, HOLROYD & YOST, Charleston, West Virginia, for Appellants. Peter Buscemi, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Appellees. Sushma Soni, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. **ON BRIEF:** Frederick P. Holroyd, II, HOLROYD & YOST, Charleston, West Virginia, for Appellants. David W. Allen, Office of the General Counsel, UMWA HEALTH AND RETIREMENT FUNDS, Washington, D.C.; John R. Mooney, Marilyn L. Baker, MOONEY, GREEN, BAKER, GIBSON & SAINDON, P.C., Washington, D.C., for Appellees. Frank W. Hunger, Assistant Attorney General, Rebecca Aline Betts, United States Attorney, Douglas N. Letter, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

_____

**OPINION**

WILKINSON, Chief Judge:

Appellants, Darrell Keenan and various businesses owned by him and his wife Janet, appeal the district court's grant of summary judgment to the Trustees of the United Mine Workers of America Combined Benefit Fund ("1992 Plan") in a suit brought to collect unpaid premiums. Appellants contest their liability to the 1992 Plan on several grounds. Initially, appellants argue that the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-22 ("Coal Act"), violates their right to due process under the Fifth Amendment. Appellants Keenan Trucking and Darrell Keenan also argue that the Trustees of the 1992 Plan are estopped from bringing suit against them due to a prior settlement. Lastly, appellants Keenan Trucking and Cedar Trucking contend that they are not proper parties to this suit because they are not "related parties" to the coal operator who

2

originally owed premiums to the 1992 Plan. See 26 U.S.C. § 9701(c)(2). We hold that the Coal Act is constitutional and find appellants' other contentions to be meritless. We thus affirm the judgment of the district court.

I.

The provision of health benefits for retired coal mine workers and their dependents has been a divisive issue in the history of labor-management relations in the coal industry. In 1946, the United Mine Workers of America ("UMWA") instituted a nationwide strike over the coal operators' refusal to create a fund to provide miners with health and retirement benefits. The effects of the strike on the national economy led President Truman to nationalize the coal mines and order the Secretary of Labor to negotiate an agreement that would return the miners to work.

The mines reverted to private control in 1947. The terms and conditions of miner health and retirement benefits were thereafter determined in a series of National Bituminous Coal Wage Agreements ("NBCWAs") between the UMWA, members of the Bituminous Coal Operators' Association, and other coal operators who agreed to be bound by the national wage agreements. The 1950 NBCWA was particularly significant because it established the United Mine Workers Welfare and Retirement Fund of 1950 ("1950 UMWA Plan"), a private multiemployer benefit plan funded by signatory coal operators who agreed to contribute on a per-ton royalty basis at rates specified in successive NBCWAs or amendments.

In the years that followed, the 1950 UMWA Plan and the subsequently created 1974 UMWA Plan greatly expanded the scope of medical benefits and other services available to retired miners. The Plans began to show signs of financial distress, however, due to a combination of demographic and economic changes in the late 1970s. Plan revenues dropped substantially as many coal operators went out of business or switched to non-union labor. At the same time, health care costs rose dramatically. The problem was further exacerbated by the aging of the beneficiary population.

These changes again produced intense labor-management strife over the issue of retiree benefits, culminating in a 111-day strike in

3

1978. Negotiations led to the 1978 NBCWA, which made several significant changes in the administration of the UMWA benefit plans. For example, the 1978 NBCWA provided that the responsibility for funding benefits for "orphaned" retirees -- retirees whose last employer went out of business or otherwise ceased contributing to the UMWA benefit plans -- would remain with the 1974 UMWA Plan. The orphaned retiree problem greatly increased the financial strain on the 1974 UMWA Plan. As more coal operators went out of business, the 1974 UMWA Plan was left with more orphaned retirees and a smaller funding base to provide for those beneficiaries.

By the late 1980s, the UMWA Plans were facing insolvency, and once again the issue of continued, stable funding for retiree benefits contributed to protracted labor unrest. In 1989, mine workers went on an eleven-month strike against the Pittston Coal Company, which ended only after the Secretary of Labor intervened and brokered a settlement of the dispute. In an effort to preempt future problems like the one at Pittston, the Secretary established the Advisory Commission on Mine Workers Retiree Health Benefits ("Coal Commission"), a bipartisan commission charged with assessing the financial prospects of the UMWA health benefit plans and formulating recommendations to ensure their long term viability. The Coal Commission concluded:

> (1) that retired miners are entitled to health care benefits that were promised them and that such commitments must be honored; (2) that a statutory obligation to contribute to the trusts should be imposed on current and former signatories to NBCWAs; and (3) that mechanisms should be enacted to prevent the future dumping of retiree health care costs on the UMWA Trusts.

Davon, Inc. v. Shalala, 75 F.3d 1114, 1118 (7th Cir. 1996). After holding hearings to consider the Coal Commission's recommendations, Congress enacted the Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, 106 Stat. 3036 (1992) (codified at 26 U.S.C. §§ 9701-9722).

The provisions of the Coal Act reflect Congress' finding that, "in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retir-

4

ees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees." 26 U.S.C. § 9701 note. Among the provisions of the Act was the establishment of the 1992 Plan to provide health benefits to retirees who were eligible but not yet covered under previous UMWA benefit plans, and who were not receiving benefits directly from their former employers. 26 U.S.C. § 9712.

Benefits paid by the 1992 Plan are funded through premiums paid by "1988 last signatory operators." A "1988 last signatory operator" is a coal operator who signed the 1988 NBCWA and was the most recent coal industry employer of an eligible beneficiary. 26 U.S.C. §§ 9701(c)(1), (3), (4); 26 U.S.C. § 9712(d)(6). Each affected coal operator is required to pay annual and monthly premiums to the Plan and to provide security for the projected cost of covering eligible beneficiaries. See 26 U.S.C. § 9712(d)(1)(A)-(C).

In order to ensure that coal operators would not be able to avoid their obligations to the 1992 Plan, Congress provided that "any related person" to an operator obligated to make payments to the Plan would be jointly and severally liable for those obligations. 26 U.S.C. § 9712(d)(4). The term "related persons" is broadly defined to include a coal operator's individual partners and corporate affiliates, or other trades or businesses controlled by a coal operator's principal shareholder or corporate parent. 26 U.S.C. § 9701(c)(2).

On December 21, 1993, the Trustees of the 1992 Plan brought a civil enforcement action to collect premiums owed to the Plan by West Virginia coal operator First Big Mountain. Because First Big Mountain was in bankruptcy proceedings, the Trustees filed suit against several West Virginia corporations owned by the president and 100 percent owner of First Big Mountain, Darrell Keenan, and his wife, Janet Keenan. The Trustees alleged that these corporations were "related persons" under the Coal Act and were therefore jointly and severally liable for premiums owed by First Big Mountain to the Plan.

In ruling for the Trustees, the district court declined to accept the defendants' various objections to the payment of premiums. Specifically, the district court upheld the constitutionality of the Coal Act,

5

held that the defendants were all "related persons" to First Big Mountain under that Act, and rejected the argument that Darrell Keenan and Keenan Trucking were released from liability under the Act by a previous settlement with the old UMWA plans. The court found that the Trustees were entitled to interest, liquidated damages, reasonable attorneys fees, and costs in addition to an award of annual prefunding and monthly per beneficiary premiums owed to the 1992 Plan. This appeal followed.

## II.

We turn first to appellants' contention that the Coal Act violates the Fifth Amendment. It is difficult to exaggerate the burden that appellants must overcome to carry the day on this argument. Congress enacted the Coal Act in response to a history of labor disputes which had significant effects on interstate commerce. Recognizing the vital importance of stable coal production to the national economy, Congress acted to head off further disputes by guaranteeing the stability of retired coal workers' benefits. Thus, the Coal Act emerges as "a classic example of an economic regulation -- a legislative effort to structure and accommodate `the burdens and benefits of economic life.'" Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 83 (1978) (citation omitted).

When, as with the Coal Act, Congress legislates within the core of its commerce power to regulate economic matters, such legislation carries a heavy presumption of validity. As the Supreme Court has stated, "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality . . . ." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976). In fact, there have been no cases since Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330 (1935), in which the Supreme Court has struck down purely economic legislation on substantive due process grounds. See In re Chateaugay Corp., 53 F.3d 478, 487 (2d Cir. 1995). In the modern era, the Court has deferred to the greater fact-finding abilities and expertise of the other branches in the economic arena. If a piece of economic legislation "is supported by a legitimate legislative purpose furthered by a rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive

6

branches." <u>Pension Benefit Guaranty Corp. v. R. A. Gray & Co.</u>, 467 U.S. 717, 729 (1984).

Appellants argue, however, that because the Coal Act imposes a new liability for actions taken in the past it is "harsh and oppressive" and therefore violates the Fifth Amendment. This argument fails on two grounds. First, the Supreme Court has explained on more than one occasion that the "harsh and oppressive" rubric is simply shorthand for "the [general] prohibition against arbitrary and irrational" legislation. <u>Id</u>. at 733; <u>see also United States v. Carlton</u>, 114 S.Ct. 2018, 2022 (1994).

In addition, while the Coal Act does impose a new obligation on a coal operator to pay premiums to the 1992 Plan based on its past act of signing an NBCWA, the Supreme Court has ruled that it is permissible to impose new duties or liabilities based on past acts. In <u>Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California</u>, 508 U.S. 602 (1993), the Court addressed a similar challenge to the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1461, on the ground that the law imposed liability upon an employer wishing to withdraw from a pension plan even though the employer's contributions to that plan came prior to the enactment of the statute. In response the Supreme Court stated:

> [I]t may be that the liability imposed by the Act . . . was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

<u>Id</u>. at 637 (citations omitted). While the Court has cautioned that "[t]he retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process," <u>Turner Elkhorn</u>, 428 U.S. at 17, it has likewise made clear that the "strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively." <u>Gray</u>, 467 U.S. at 729. Thus, the basic test remains the same regardless of the "retroac-

7

tive" nature of a statute: whether the statute is rationally related to a legitimate legislative purpose. Id. at 729-30.

That the Coal Act was enacted to further a legitimate governmental purpose cannot seriously be disputed. The avowed aim of the Act is "to remedy problems with the provision and funding of health care benefits" for retirees in the coal industry. 26 U.S.C. § 9701 note. The national importance of that goal is clear. Disputes over the funding of benefits had led to three major strikes with a high probability of future labor unrest due to the precarious financial condition of the UMWA benefit plans in the late 1980s and early 1990s. Given the importance of coal production to interstate commerce and the potential for severe economic disruption if the funding of health benefits remained unstable, we cannot say that the animating purposes of the Coal Act are other than legitimate.

We also have no difficulty in concluding that the Coal Act employs rational means to achieve its purpose. The group Congress identified to fund the 1992 Plan consists of the employers who profited from the labor of the beneficiaries of the Plan. "When viewed in this light, it would have been irrational to draw the line anywhere other than" NBCWA signatories. Davon, 75 F.3d at 1124. In upholding the statute requiring coal operators to fund benefits for miners suffering from Black Lung Disease, the Supreme Court specifically recognized that Congress rationally "spread the costs of the employees' disabilities to those who have profited from the fruits of their labor . . . ." Turner Elkhorn, 428 U.S. at 18.

Further, it was rational for Congress to assign the costs of funding the 1992 Plan to NBCWA signatories because those agreements guaranteed lifetime benefits to coal miners. See District 29, UMWA v. UMWA 1974 Benefit Plan and Trust, 826 F.2d 280, 282 (4th Cir. 1987) ("[The] intentions of the parties in providing for retirement health benefits was to guarantee their provision for life."). In fact, "Congress found that all employers who were signatories to wage coal agreements . . . created an expectation of lifetime benefits, and it determined that the fairest means to fund these liabilities was through premiums allocated among these operators." Lindsey Coal Mining Co. v. Chater, 90 F.3d 688, 694 (3d Cir. 1996) (citing 138 Cong. Rec. S17603 (daily ed. Oct. 8, 1992) (conference committee

8

report)); see also Blue Diamond Coal Co. v. Shalala, 79 F.3d 516, 522 (6th Cir. 1996). Coal operators benefited directly from their promises because those promises helped secure the availability of quality labor for their business operations. The coal industry was also able to use the promise of benefits to secure concessions from labor on other fronts. For example, the 1950 UMWA Plan was instituted in exchange for the UMWA's acquiescence in the mechanization of the mines. We cannot accept appellants' suggestion that it would be irrational for Congress to require the parties who benefited from promises of secure benefits to live up to those promises. See Chateaugay, 53 F.3d at 491.

Appellants argue that it was irrational for Congress to place the cost of securing benefits for retired coal workers on coal operators because the operators did not cause the funding shortfall that precipitated congressional intervention. Instead, they argue that the funding shortfalls were the result of mismanagement by the fund trustees. However, one of the specific reasons Congress identified for placing the burden of funding the 1992 Plan on coal operators was that it found those operators to be the "persons most responsible for plan liabilities . . . ." 26 U.S.C. § 9701 note. It was not irrational for Congress to conclude that one of the primary reasons for the financial difficulties experienced by the UMWA plans was the withdrawal of contributing employers from the UMWA multiemployer system, which created the dual problem of a growing population of "orphaned" retirees and a shrinking contribution base. See Coal Commission Report: A Report to the Secretary of Labor and the American People 2, 42 (Nov. 1990); see also Chateaugay, 53 F.3d at 490.

Even if appellants could demonstrate that they had no responsibility for the funding crisis, however, it would not throw the constitutionality of the Coal Act into doubt. The Supreme Court has never held that only responsible parties may bear the burden of remedial legislation. See Davon, 75 F.3d at 1125 n.9. Such a rule would hamper Congress' ability to address problems in areas where it is difficult to find a precise "cause," and would threaten Congress' ability to impose remedial burdens on the public at large, which rarely can be identified as the direct cause of the specific ills addressed by a given piece of economic legislation.

9

Thus, legislation need not place remedial burdens on the "most responsible" party to survive rational basis scrutiny. The legislative means need only be reasonably related to some legitimate governmental end. For the reasons outlined above, we hold that the Coal Act meets that standard. In upholding the constitutionality of the Coal Act, we join the unanimous opinion of the circuits which have considered this issue. See Lindsey Coal Mining Co. v. Chater, 90 F.3d 688 (3d Cir. 1996); Blue Diamond Coal Co. v. Shalala , 79 F.3d 516 (6th Cir. 1996); Davon, Inc. v. Shalala, 75 F.3d 1114 (7th Cir. 1996); In re Chateaugay Corp., 53 F.3d 478 (2d Cir. 1995).

III.

Appellants Darrell Keenan and Keenan Trucking argue that the Trustees of the 1992 Plan are estopped from bringing suit against them because of a settlement in a prior lawsuit between themselves and the Trustees of the 1950 and 1974 UMWA Benefit Plans. The settlement released Keenan Trucking and Darrell Keenan from future liability to those plans. Keenan and Keenan Trucking argue that the settlement should act as a release from liability to the 1992 Plan because both suits were brought to recover premiums used to fund benefits for retired coal workers.

We are unpersuaded. As appellants concede, neither the 1992 Plan nor its Trustees were parties to this previous settlement. They therefore cannot be legally bound by its terms. Moreover, they could not possibly have been parties to the settlement because it was executed, and the action dismissed, before Congress had even passed the Coal Act. In addition, appellants provide no legal authority for the proposition that a contract between private parties can relieve one of them from statutory obligations such as those imposed by the Coal Act. Indeed, the Supreme Court has held to the contrary:

> Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.

10

Concrete Pipe, 508 U.S. at 642 (quoting Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 223-24 (1986)); see also Davon, 75 F.3d at 1125.

IV.

Lastly, two of the appellants, Keenan Trucking and Cedar Trucking, argue that they are not proper parties to this suit because they are not "related persons" with regard to First Big Mountain. Under section 9712(d)(4) of the Coal Act, a person who is "related" to a coal operator who owes premiums to the 1992 Plan is jointly and severally liable for those premiums. Thus, Congress acted to secure stable funding for the Plan by ensuring that coal operators would be unable to evade their responsibilities to the Plan by going out of business or declaring bankruptcy.

Under section 9701(c)(2)(A)(i) of the Coal Act, an entity is a "related person" to a signatory operator if both are members of a controlled group of corporations as defined in section 52(a) of the Internal Revenue Code ("I.R.C."). 26 U.S.C. § 9701(c)(2)(A)(i). In turn, section 52(a) provides that "the term `controlled group of corporations' has the meaning given to such term by section 1563(a) . . . ." 26 U.S.C. § 52(a). I.R.C. section 1563(a) sets out three different types of controlled groups. The only category of controlled group relevant to this case is the "brother-sister controlled group" which is defined as follows:

> (2) Brother-sister controlled group. -- Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing --
>
> (A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and
>
> (B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote

11

or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

26 U.S.C. § 1563(a)(2) (emphasis added).

Appellants in this case demonstrate a high degree of interrelatedness. First Big Mountain has been owned entirely by Darrell Keenan since its incorporation. Darrell Keenan and his wife, Janet Keenan, have each owned 50 percent of Keenan Trucking at all times relevant to this suit. Cedar Trucking has been 100 percent owned by Janet Keenan since its incorporation. Appellants argue nonetheless that since Darrell Keenan does not own "more than 50 percent" of either Keenan Trucking or Cedar Trucking and since Janet Keenan has no ownership interest in First Big Mountain, those entities may not be considered part of a brother-sister controlled group or related persons under the Coal Act.

This argument might prevail, were it not for the spousal attribution rule regarding stock ownership found at section 1563(e)(5) of the I.R.C. Under this rule, "[a]n individual shall be considered as owning stock in a corporation owned, directly or indirectly, by or for his spouse . . . ." 26 U.S.C. § 1563(e)(5). If this rule applies, Darrell Keenan is effectively the 100 percent owner of Keenan Trucking and Cedar Trucking, and, accordingly, those corporations clearly would be part of a brother-sister controlled group with First Big Mountain under section 1563(a)(2) and related parties under the Coal Act.

Appellants' contention that the spousal attribution rule does not apply to the Coal Act is groundless. The Coal Act specifically refers to section 1563(a) of the I.R.C., and section 1563(a)(2) in turn states that ownership must be determined with reference to section 1563(d)(2). Section 1563(d)(2)(B) instructs that "[f]or purposes of determining whether a corporation is a member of a brother-sister controlled group of corporations . . . stock owned by a person who is an individual, estate, or trust means stock owned with the application of subsection (e)." 26 U.S.C. § 1563(d)(2)(B). Appellants have made no argument as to why this clear cross-reference to the spousal

12

attribution rule in subsection (e) should not apply, and we find no basis for ignoring the language of the statute.

Appellants suggest that even if the spousal attribution rule does apply, they fall within the exception to the rule set forth at 26 U.S.C. §§ 1563(e)(5)(A)-(D). In order to come within the exception, a spouse must meet four separate requirements. Darrell Keenan does not qualify for the exception as to Keenan Trucking because he runs afoul of the first requirement that "[t]he individual does not, at any time during such taxable year, own directly any stock in such corporation." 26 U.S.C. § 1563(e)(5)(A). It is undisputed that Darrell Keenan owns 50 percent of Keenan Trucking, and, given Janet's 50 percent share, he therefore must be considered the 100 percent owner of Keenan Trucking under the spousal attribution rule.

The spousal attribution rule must also apply with regard to Cedar Trucking because Darrell Keenan cannot satisfy the requirement of section 1563(e)(5)(B), which mandates that the "individual . . . does not participate in the management of such corporation at any time during such taxable year." The record indicates that Darrell Keenan has been a major participant in the management of Cedar Trucking since its incorporation. Keenan testified in his deposition that since May 1991 he has used Cedar Trucking's trucks for coal hauling and other enterprises in conjunction with his operation of Keenan Trucking. Keenan also testified that Keenan Trucking made the monthly payments owed by Cedar Trucking to various financing companies and that he has negotiated truck and contract hauling agreements on behalf of Cedar Trucking. Based on this record, we find that the district court did not err when it determined that Keenan could not satisfy the exception to the spousal attribution rule.

Since Darrell Keenan must be considered the constructive owner of both Keenan Trucking and Cedar Trucking under the spousal attribution rule, and because Darrell Keenan was also the 100 percent owner of First Big Mountain, we hold that the district court properly found these entities to be part of a brother-sister controlled group and therefore related persons under the Coal Act. Accordingly, both Keenan Trucking and Cedar Trucking are jointly and severally liable under 26 U.S.C. § 9712(d)(4) for First Big Mountain's liabilities to the 1992 Plan.

13

V.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

14