**Michael H. HOLLAND, et al., Plaintiffs,**

v.

**PARDEE COAL COMPANY, INC., et al., Defendants.**

**No. CIV. A. 98–110–A.**

United States District Court, W.D. Virginia. Abingdon Division.

April 7, 2000.

Peter Buscemi, Washington, DC, John Ellsworth Kieffer, Bristol, VA, for Plaintiffs/Counter–Defendants.

Daniel R. Bieger, Abingdon, VA, Mary Lou Smith, Washington DC, for Defendants/Counter Claimants.

### MEMORANDUM OPINION AND ORDER.

GLEN M. WILLIAMS, Senior District Judge.

## I THE CASE AND CONTROVERSY

The Plaintiffs, trustees of the United Mine Workers of America Combined Ben-

efit Fund ("Combined Fund"), filed suit in this court setting forth allegations that the Defendants, current or past coal operators and related parties, are jointly and severally liable for unpaid health care premiums for certain assigned beneficiaries (retired coal miners) of the Combined Fund. The Combined Fund is a trust fund created by Congress under the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act") to provide health and death benefits to retired coal miners and their dependents.

There are three assignments made to the principal Defendant, Pardee Coal Company, that are contested here. In a letter dated September 28, 1993, Pardee received notice of its responsibility for the assignment of Curtis Hess. (Mem. Supp. Defs.' Mot. Summ. J. at 14.) In two other letters dated September 20, 1995 and September 22, 1997, Pardee received similar notices of assignment for Grover Bolling and Orvil Brewer, respectively. *Id.* The Plaintiff trustees claim that the Combined Fund has paid out $86,102.62 in health care claims on behalf of these three beneficiaries. (Pls.' Mem. Supp. Mot. Summ. J. at 9.) From October 1, 1993 through June 25, 1999, Pardee made partial payments to the fund In the amount of $28,604.19. (*Id.* at 9–10; Mem. Supp. Def.'s Mot. Summ. J. at 14.) Pardee now counterclaims for the payments already made, (Mem. Supp. Def.'s Mot. Summ. J. at 14), and the trustees claim the balance of $57,498.43, as well as accrued interest, liquidated damages and attorneys' fees. (Pls.' Mem. Supp. Mot. Summ. J. at 8, 16–17.)

Upon consideration of each party's motion for summary judgment, the court makes the following rulings respecting the various claims and contentions of the parties: i) Pardee Coal Company was a "me too" signatory to the 1978 National Bituminous Coal Wage Agreement; ii) the Coal Act requires the assignments to be made no later than October 1, 1993; and iii) the Coal Act is constitutional. Therefore, the Bolling and Brewer assignments are void as a matter of law. However, the Hess assignment is binding on Pardee and Pardee is liable for any deficiency, or entitled to any excess, in payments pursuant to that assignment. Furthermore, the Defendants are jointly and severally liable for any deficiency. A final judgment as to the Plaintiffs' claim for fees, costs and liquidated damages must await a determination as to whether Pardee has "an obligation to pay" a deficiency as required by 26 U.S.C. § 9721 (West Supp.1999). Accordingly, each party is entitled to a partial summary judgment that gives full effect to this opinion.

## A. THE POSITION OF THE DEFENDANTS

The Defendants deny liability on the following four grounds: i) the assignments were untimely when made and are thus void as a matter of law; ii) the principal defendant Pardee Coal Company was never a "signatory operator" as required for Combined Fund liability under the Coal Act; iii) the additional Defendants, even if they are "related parties" under the Coal Act, are not jointly and severally liable; and iv) the current funding mechanism for the Combined Fund established by the Coal Act is unconstitutional under the Fifth Amendment.

The Defendants claim the assignments were untimely because they were made after October 1, 1993, as set forth in the Coal Act as the date by which the Social Security Administration shall make its initial assignments. This, the Defendants assert, was a final date after which no further assignments could be made. Furthermore, the Defendants contend that the assignments are void because they were not signatories to the National Bituminous Coal Wage Agreement of 1978 ("1978 NBCWA") and thus are not liable for the subsequent revisions to the agreement which, under the Coal Act, ultimately established the funding provisions of the Combined Fund. To be liable, the operator must be a signatory to a coal wage agreement.

Moreover, the argument continues, the Defendants named in addition to the principal defendant, Pardee Coal Company, cannot be liable if the assignments to Pardee are void because claims against "related persons" are derived from the underlying claim and cannot stand alone. In addition, the additional Defendants claim that they neither employed the assigned individuals, nor were responsible in any way for the circumstances giving rise to the need for the legislative response embodied by the Coal Act. As a result, they deny both individual and joint and several liability for any contributions to the Combined Fund.

The final claim put forth by the Defendants is that the funding provision of the Coal Act is unconstitutional under a recent United States' Supreme Court decision, *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), and that the offending provision is not severable from the Act as a whole. As a result of the lack of severability, the Defendants argue that the entire Act must be struck down. In the alternative, the Defendants ascribe the Coal Act as unconstitutional in its application to them.

B. THE POSITION OF THE PLAINTIFFS

The Plaintiffs countervail that October 1, 1993 merely represented a congressional goal for completing the assignments, if possible, but in no way suspended agency power to make subsequent assignments. (Reply Mem. Supp. Pls.' Mot. Summ. J. at 23.) As support, the Plaintiffs cite a number of cases establishing that the passage of a statutory deadline does not necessarily end an agency's power to act where important public interests are at stake. *Id.; see e.g., Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986).

The claimed interest here is ensuring that liability for the future health care of coal industry retirees be allocated to the responsible parties, the coal operators that formerly employed the miners. To date, nearly 10,000 beneficiaries have been assigned after October 1, 1993. (Reply Mem. Supp. Pls.' Mot. Summ. J. at 5, 32–34.) A ruling that assignments made after this date are void, the argument goes, would utterly frustrate the congressional purpose of the Coal Act because those assignees would then become part of the unassigned pool, whose benefits would be paid by unrelated entities who had no responsibility for the beneficiary. Thus, Congress could not have intended that October 1, 1993 be the final date for assignments under the Act.

The Plaintiffs further maintain that the assignments were not only timely, but binding on Pardee Coal Company as well because of its status as a signatory operator under the Coal Act. By the Plaintiffs' account, Pardee is, by its own admission, a signatory because it negotiated a wage agreement in 1978 that was essentially identical to, and incorporated by reference, the terms of the 1978 NBCWA. (Reply Mem. Supp. Pls.' Mot. Summ. J. at 11 (citing Mem. Supp. Def.'s Mot. Summ. J. at 14).)

In addition, relying on what the Plaintiffs believe to be a plain reading of the Coal Act, all of the Defendants are "related persons" because they are either successors in interest to the principal defendant Pardee Coal, or they are corporations existing under common control, and as a result, are jointly and severally liable for the assigned obligations to the Combined Fund.

Finally, the Plaintiffs disagree with the Defendants' interpretation of the *Eastern* holding. *Eastern,* according to the Plaintiffs, is a narrow holding specifically addressed to the unique facts of that case and is applicable only in subsequent cases that involve similarly situated parties. Accordingly, the Plaintiffs' position is that the facts of the case at bar are far too dissimilar to *Eastern* for it to represent controlling precedent over this matter.

## II HISTORY OF THE COAL ACT

The great history of America's coal industry is unfortunately imbued with bloodshed and human tragedy. The portrait of the working and living conditions of the Nineteenth and early Twentieth Century coal miner is an appalling scene indeed. The miner's every workday was fraught with dangers of both a direct and indirect nature. On-the-job deaths and injuries by the tens of thousands resulted from methane explosions, cave-ins and other innate hazards of the occupation. Unknown to the early miner, a far more insidious but no less dangerous hazard invaded them with every breath in the form of silicosis and pneumoconiosis, collectively and modernly known as the dreaded "Black Lung" disease.

In addition to these physical dangers, the miners and their families endured a stark, pallid and insecure existence. The miners earned very low wages, and due to the rural nature of the mining industry, it was often necessary for miners to live in company towns where the mine operators essentially owned and controlled everything from the stores where the miners purchased necessities to the houses and apartments in which the families lived. In addition to low wages and unusually long work days, such absolute dependence on the mining companies forced miners to endure exorbitant and disproportionate prices for goods, sub-par company-provided physicians, and even arbitrary evictions from company housing into tent colonies for simply speaking out or displaying any civil disobedience to the omnipotent authority of the coal barons.

From this oppression arose the need for miners to form a collective voice that would enable them to bring about the fundamental changes necessary to offer the mining family an opportunity to a decent way of life. In 1890, the United Mine Workers of America ("UMWA") was born to effectuate this change. Unfortunately, early attempts at collective bargaining between operators and the UMWA often more closely resembled a battlefield than a stage of negotiation. Now infamous clashes, the Lattimer Massacre, the Ludlow Massacre, Matewan, Blair Mountain, Paint Creek and Bloody Harlan, name but a few of the events in which scores of people lost their lives through violent outbursts against the other by both UMWA members and the coal operators.

Empowered by the National Industry Recovery Act, by 1933 the UMWA occupied a formidable presence in the politics of organized labor, a presence it maintains to this day. In the 1940s, miner's health care became the UMWA's ultimate concern. *Eastern Enterprises v. Apfel,* 524 U.S. 498, 505, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). A fallout in health care negotiations between the mine operators and the UMWA led to a national coal miner strike in 1946 that required Presidential intervention. By executive order, President Truman ordered the Secretary of the Interior to take control of the mines and negotiate suitable terms of employment for the miners. 11 Fed.Reg. 5593 (1946); *Eastern Enterprises,* 524 U.S. at 505, 118 S.Ct. 2131.

Following a week of negotiations, the parties reached an agreement that ultimately lead to the National Bituminous Coal Wage Agreement of 1947 ("1947 NBCWA"). *Eastern Enterprises,* 524 U.S. at 505–06, 118 S.Ct. 2131. This agreement created the UMWA Welfare and Retirement Fund ("1947 W & R Fund") that provided for medical and pension benefits for miners and their families through royalties collected on coal production. Despite the agreement, unrest continued between the parties over the scope and amounts of coverage, leading to a new agreement in 1950. The 1950 NBCWA created a multi-employer trust fund, the 1950 W & R Fund, funded by a fixed, per-ton royalty ($.30) on each ton of coal produced. *Id.* at 506, 118 S.Ct. 2131. The new agreement gave the fund's trustees the authority to administer the trust in such a way as to secure its fiscal viability.

Responding to the UMWA's now powerful bargaining position in the industry, the mine operators formed their own organization the following year, called the Bituminous Coal Operators Association ("BCOA"). *Id.*

In 1974, the BCOA and UMWA negotiated a new agreement in order to comply with the pension funding provisions of the newly passed Employee Retirement Income Security Act ("ERISA"). *Id.* at 509, 118 S.Ct. 2131. The 1974 NBCWA established four trusts, two of which, the 1950 Benefit Plan and the 1974 Benefit Plan, are relevant here. The 1950 Benefit Plan provided post-retirement health care benefits for miners' retiring before January 1, 1976, while the 1974 Benefit Plan provided coverage for active miners and future retirees. *Id.* Thus, the 1974 NBCWA between the UMWA and the BCOA was the first agreement providing for post-retirement healthcare benefits for miners. *Id.*

The royalties required for funding the Benefit Plans under this new agreement remained unchanged from the 1950 NBCWA, however, and that would soon prove problematic as the expanded coverage to retirees under the new agreement dramatically increased the numbers of eligible recipients. In addition, reductions in coal production and ever-increasing health care costs decreased the available funds resulting in a funding crisis. The parties met to address the crisis, negotiating the 1978 NBCWA whereby each signatory operator agreed to assume the fiscal responsibility for health care claims brought by those miners the operator actually employed then or at some time in the past. *Id.* at 510, 118 S.Ct. 2131. Those miners whose employers had since gone out of business remained covered under the 1974 NBCWA. *Id.*

Notwithstanding the attempts to alleviate fiscal difficulties, financial conditions worsened as mine operators began to abandon the Benefit Plans. As more and more operators pulled out, the obligations on those that remained continually increased. In 1988, the UMWA and BCOA met to remedy this situation, imposing liability on withdrawing operators. *Id.* at 511, 118 S.Ct. 2131. However, when Pittston Coal Company refused to sign the agreement, an eleven-month strike ensued that prompted Elizabeth Dole, the Secretary of Labor at that time, to intervene and negotiate a settlement. *Id.*

The settlement established a bipartisan commission ("Coal Commission") to examine the Benefit Plans' financial condition and to make recommendations for change that would ensure the long-term fiscal viability of health care for miners. *Id.* The Coal Commission found that miners were entitled to the health benefits that mine operators had promised to them in the past and that the obligations for health care costs should be imposed on current and former signatories to a NBCWA. *Holland v. Keenan Trucking Co.,* 102 F.3d 736, 739 (4th Cir.1996).

Acting upon the Coal Commission's recommendations, Congress passed the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), Pub.L. No. 102–486, 106 Stat. 3036 (codified as amended at 26 U.S.C. §§ 9701–9722 (West Supp.1999)). *Id.* The Coal Act formed the United Mine Workers of America Combined Benefit Fund by merging the pre-existing 1950 and 1974 Benefit Plans. 26 U.S.C. § 9702(a)(2). The provided benefits remained unchanged but the funding provisions were dramatically revamped and have led to volumes of litigation since, including the case at hand.

As referred to earlier, NBCWAs prior to 1978 relied on operational royalties, paid on a per-ton production basis, for health care funding. However, following the 1978 NBCWA and under the Coal Act, individual mine operators became liable for specific, assigned beneficiaries. *Cf. Carbon Fuel Co. v. USX Corp.,* 100 F.3d 1124, 1128 (4th Cir.1996). Congress did so in order to place funding responsibilities on the "persons most responsible for plan liabilities."

*Id.* In other words, Congress intended to extend liability to those who fostered miners' expectations of life-long benefits and who benefitted from the concession made by the miners during dispute negotiations in exchange for that promise. *Id.* at 1129.

Accordingly, Congress required "signatory operators" who were still "in business" and who employed a particular beneficiary in the past to assume liability for the future health care of that beneficiary. 26 U.S.C. § 9706; *Carbon Fuel Co.*, 100 F.3d at 1128. A signatory operator is a company that signed any previous coal wage agreement. § 9701(c)(1); *Carbon Fuel Co.*, 100 F.3d at 1128. The operator is still "in business" if the company presently generates revenue from any source, coal related or not. § 9701(c)(7); *Carbon Fuel Co.*, 100 F.3d at 1128.

Furthermore, previous employment of a coal industry retiree by a signatory operator is considered as employment by any "related person" to that operator. § 9706(b)(1). A related person is a member of a controlled group of corporations that includes the signatory operator, any business under common corporate control with the signatory operator, or any other person having a partnership interest with the signatory operator in a coal related business, but only with respect to eligible beneficiaries. § 9701(c)(2)(A). Related parties are jointly and severally liable for assignments under the Act. § 9711(c).

Finally, all signatory operators were to assume a proportionate share of the liability for "orphaned retirees," those retired miners whose employers had gone out of business and left no related parties to which the miner could be assigned. § 9704(d).

Congress placed the responsibility for assigning beneficiaries on the Social Security Administration ("SSA"). § 9706(a). The Act mandated that the Commissioner shall assign each eligible coal industry retiree to a signatory operator by October 1, 1993. *Id.* The priority of assignment required that the SSA first attempt to assign the retiree to the operator who was a signatory to the 1978 Wage Agreement or any subsequent agreement, and was the most recent signatory operator to employ the retiree for at least two years. § 9706(a)(1).

If the retiree could not be so assigned then the SSA was to assign the retiree to an operator who was a signatory to the 1978 Wage Agreement or any subsequent agreement, and was the most recent signatory operator to employ the retiree for any length of time. § 9706(a)(2). If the retiree could not be assigned under either paradigm above, then assignment would be to the signatory operator who employed the retiree for the longest period prior to the 1978 Wage Agreement. § 9706(a)(3). This final funding provision, the "reach-back" provision, theoretically could impose retroactive liability for activities that occurred several decades prior to the implementation of the Coal Act's assignment scheme. Because of its retroactive nature, the "reach-back" provision has been challenged repeatedly under the Takings and Due Process Clauses of the Fifth Amendment, and in a limited sense, the case at bar is no exception.

## III LEGAL ANALYSIS

Both parties to this case have moved for summary judgment. Summary judgment must be granted whenever the evidence presented shows that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When applied, rule 56 narrows this case to just three issues: i) was Pardee a "signatory operator" as defined by the Coal Act; ii) did October 1, 1993 represent the final day for making assignments under the Act; and iii) is the Coal Act itself constitutional? For reasons set forth below, the court holds that each of these questions must be answered in the affirmative.

### A. WAS PARDEE A SIGNATORY OPERATOR?

■ Pardee claims that it was not a signatory to the 1978 National Bituminous

Coal Wage Agreement because it did not sign the "actual" NBCWA, but only the appendix. (Mem. Supp. Def.'s Mot. Summ. J. at 4–5.) This determination is of paramount importance because in order to be assigned a beneficiary under the Coal Act, Pardee must have been a signatory to a coal wage agreement. 26 U.S.C. § 9701, 9706. Moreover, Pardee argues, it was never a member of the BCOA (the organization responsible for negotiating on behalf of the industry since 1951) and thus was never privy to the discussions that led to the 1978 NBCWA; it was not provided any documentation of that agreement; and it never signed any amendment to the 1978 agreement with the UMWA.

However, the court cannot agree with Pardee's position. The determination of Pardee's signatory status, in part, naturally flows from this classic contract question: As of the signing of the appendix in 1978, what were the intentions and expectations of Pardee and the UMWA? An overwhelming cornucopia of legal authority favors the Plaintiffs on this issue.

Following the Pittston strike of 1988–89, the Coal Commission determined that coal miners were promised lifetime health care benefits under previous coal wage agreements and that the miners traded lower pensions for those promises. *Eastern Enterprises v. Apfel,* 524 U.S. 498, 511–12, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (citing Coal Comm'n Report, Executive Summary vii 1324); *see, e.g., Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 664 (3d Cir.1999) (stating that the threshold issue when determining signatory status is what reasonable expectations the coal companies' actions created in miners and that the expectation need not be explicit and could arise from a consistent course of past conduct); *Davon, Inc. v. Shalala,* 75 F.3d 1114, 1124–25 (7th Cir.1996) (stating that it is rational to conclude that a legitimate expectation of lifetime health benefits under the Coal Act arose from the actions of every signatory operator who participated in the development of the multi-employ-

er health benefit plans that have provided those same benefits for over fifty years).

The previous coal wage agreements referred to in the Coal Commission's findings date all the way back to the 1940s. Despite never mentioning, explicitly, lifetime benefits until 1974, every coal wage agreement contributed to an expectation of a continuous mechanism by which such benefits would be maintained. *In re Blue Diamond Coal Co.,* 79 F.3d 516, 523 (6th Cir.1996) (citing *Davon,* 75 F.3d at 1125). It is undisputed that Pardee did sign a coal wage agreement after 1974 and prior to the Commission's findings. (Mem. Supp. Def.'s Mot. Summ. J. at 4.) Accordingly, it seems unreasonable for Pardee to suggest now that the lifetime health care benefits provided for in the 1978 NBCWA were never contemplated or expected by the parties under its "agreement" even if the court were to accept the subtle distinctions that Pardee attempts to make as to its signatory status. *Cf. Davon,* 75 F.3d at 1124–25 (stating that every NBCWA [since the 1940s] created a continuous mechanism for providing health benefit plans). Pardee's signature to the Appendix of the 1978 NBCWA is convincing evidence that, at the very least, Pardee intended to be bound by the terms of that agreement and that in signing, Pardee created an expectation of such in its employee miners.

Furthermore, the court finds that Pardee was a "me too" signatory to the 1978 NBCWA. A "me too" agreement is generally defined as an agreement that allows smaller employers to obtain the benefits of a national collective bargaining agreement without being a member in an industry association or incurring the costs of independent negotiation. *Arizona Laborers, Teamsters and Cement Masons Trust Fund v. Conquer Cartage Co.,* 753 F.2d 1512, 1518 (9th Cir.1985). "Me too" agreements also generally contain terms identical to those contained in the national agreement making no distinctions in the rights and liabilities of the respective signatories. *Connors v. Link Coal Co.,* 970

F.2d 902, 903 (D.C.Cir.1992). Consequently, the difference between a BCOA member and a "me too" signatory to a NBCWA is of no significance. *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 172 n. 4 (3d. Cir.1999).

The Defendants admit that Pardee signed "a Collective Bargaining Agreement ("1978 Wage Agreement") which was identical in all relevant respects to the 1978 National Bituminous Coal Wage Agreement executed by the United Mine Workers of America and [the] BCOA." (Mem. Supp. Def.'s Mot. Summ. J. Ex. A ¶ 2.) Pardee's director signed, on Pardee's behalf, a document entitled: "Appendix 1978 National Bituminous Coal Wage Agreement." (Pls.' Mem. Supp. Mot. Summ. J. Ex. B, tab 1.) The date of signature on the Appendix is March 28, 1978, *id.*, exactly three days after the "actual" 1978 NBCWA was signed by the BCOA and UMWA, and one day after it took effect. (Mem. Supp. Defs.' Mot. Summ. J. at 4.)

While the Defendants repeatedly refer to a separate 1978 Agreement other than the 1978 NBCWA, evidence of this agreement is no where to be found. In fact, the Defendants direct the court to the 1978 NBCWA to explain the terms of this purported separate agreement. *Id.* Pardee paid $1.3 million into the trust funds, created under the 1974 NBCWA and incorporated by reference into the 1978 NBCWA, beginning March 28, 1978, the day Pardee signed the Appendix, and ending June of 1980. Pardee's "agreement" expired on March 27, 1981. *Id.* at Ex. A ¶ 4. Not surprisingly, the 1978 NBCWA expired the exact same day.

▪ The foregoing leaves the court with the inescapable conclusion that Pardee was a "me too" signatory to the 1978 NBCWA and is thus subject to the assignment of beneficiaries under any of the three priority of assignment prongs provided by the Coal Act of 1992. Furthermore, the other named Defendants are "related parties" under the Coal Act. Under

§ 9701(c)(2)(A)(i), a corporate entity is a "related person" to a signatory operator if both are members of a controlled group of corporations as set forth in the Internal Revenue Code ("IRC").

IRC section 1563(a) states that a controlled group exists if five or fewer persons own stock possessing at least eighty percent of the total value of corporate stock in each sister company. All of the named Defendants in this case are within a controlled group of corporations given the statute's meaning. Each company here is 100 percent owned by the same four individuals. All four are from the same family. This is exactly the type of interrelatedness referred to by the Fourth Circuit in imposing joint and severally liability on several corporations owned by a married couple in *Holland v. Keenan Trucking Co.*, 102 F.3d 736, 742–43 (4th Cir.1996). Thus, all the named Defendants in this case are jointly and severally liable for any valid obligations assigned to Pardee.

### B. WAS OCTOBER 1, 1993 THE FINAL DAY FOR MAKING ASSIGNMENTS UNDER THE COAL ACT?

▪ When reviewing an agency's statutory interpretation, a Court must first consider whether Congress has directly and precisely spoken on the issue. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If so, that is the end of the matter. *Id.* The Coal Act provides that the Commissioner of the Social Security Administration "shall," before October 1, 1993, assign each coal industry retiree who is eligible. 26 U.S.C. § 9706(a). The Supreme Court has time and time again held that the word "shall," when used in a statutory context, is unmistakably mandatory in its meaning, *see, e.g., United States v. Monsanto,* 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989), with a notable exception.

The Supreme Court stated in *Brock v. Pierce County,* 476 U.S. 253, 262, 106 S.Ct.

1834, 90 L.Ed.2d 248 (1986) that the word "shall," standing alone, does not terminate agency action following the expiration of a statutorily prescribed date. *Cf. General Motors v. United States,* 496 U.S. 530, 541–42, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990); *United States v. Montalvo–Murillo,* 495 U.S. 711, 718, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990). Underlying this exception is the "great principle of public policy ... which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." *Brock,* 476 U.S. at 260, 106 S.Ct. 1834.

However, there is no substantial prejudice to public interests in requiring that the Social Security Commissioner make the assignments called for by the Coal Act by October 1, 1993. The Plaintiffs cite *Five–J Energy v. Apfel,* No. 1:97CV172, mem. op. at 5–7 (N.D.W.Va. Oct. 16, 1998) as demonstrative of its argument. There, the court held that because the Coal Act does not provide for the funding of benefits for those retired miners whose assignment came late, then hundreds of miners and their dependents will be without health care benefits and resigned to the public dole. If that were true, then this opinion might have turned out differently. However, the court's finding in that case is simply wrong.

Under the Coal Act, as conceded by the Plaintiffs at oral argument and in court briefs, those eligible beneficiaries whom the Commissioner does not assign by October 1, 1993 become unassigned beneficiaries whose health care premiums will be paid from the unassigned pool. 26 U.S.C. § 9704(d); *Dixie Fuel Co. v. Commissioner of Soc. Sec.,* 171 F.3d 1052, 1062 (1999); (Reply Mem. Supp. Pls.' Mot. Summ. J. at 26.). Therefore, the health care costs of the parties in this case will ultimately be paid even if the assignments to Pardee are voided by this court.

Furthermore, each assigned operator's calculated premium includes a portion allocated to cover that operator's proportional share of funding liability for the unassigned pool. § 9704(d). Such an allotment of liability for unassigned operators could not prejudice the public interest asserted by the Plaintiffs, namely that future health care be paid by the responsible parties, especially in light of the fact that "every signatory operator shared some responsibility in creating a legitimate expectation among miners of lifetime health benefits." *Davon, Inc. v. Shalala,* 75 F.3d 1114, 1124 (7th Cir.1996).

Moreover, the court adopts the Sixth Circuit's findings in the *Dixie Fuel* case that "shall," as used in the Coal Act, does not "stand alone." 171 F.3d at 1062. The Sixth Circuit found that the entire statutory scheme for the operation of the Combined Fund reflects a congressional intent that the assignments be completed by October 1, 1993. *Id.* The examples cited as support for that finding are convincing.

First, the Coal Act specifically defines two distinct categories of beneficiaries of the Combined Fund: assigned beneficiaries and unassigned beneficiaries. § 9701(c)(5) (defining "assigned operator"); § 9704 (establishing as part of the liability of assigned operators, a proportional share of the health care costs of the pool of "unassigned" beneficiaries); *Dixie Fuel,* 171 F.3d at 1062. Second, the total liability of assigned operators depends, not insignificantly, upon a determination of the total number of unassigned beneficiaries. § 9704(d); *Dixie Fuel,* 171 F.3d at 1062.

Third, that portion of the liability of an assigned operator for unassigned beneficiaries, known as the "unassigned beneficiaries premium," arises by dividing the number of beneficiaries assigned to that operator by the number of all assigned beneficiaries, multiplied by the number of unassigned beneficiaries. This repeated dichotomy of assigned versus unassigned beneficiary status significantly undermines the Plaintiffs' argument that Congress did not intend to establish October 1, 1993 as the final date for making assignments un-

der the Act. A natural reading of the Coal Act, in conjunction with the funding scheme referenced above, leads the court to the conclusion that Congress meant for the Commissioner to assign beneficiaries by October 1, 1993, reducing the remainder to the unassigned beneficiary pool.

## C. Is The Coal Act Constitutional?

The Defendants claim that the funding provisions for the Combined Fund under the Coal Act violate both the Due Process and Takings Clauses of the Fifth Amendment of the United States' Constitution. More specifically, they claim that since the Supreme Court struck down the "reachback" provision, and since the "reachback" provision is not severable from the Act, the entire Act must be struck down as unconstitutional. The foundation for this claim comes from the Supreme Court's holding in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

In *Eastern Enterprises*, however, five justices unequivocally stated that constitutional challenges to the funding provisions of the Coal Act must be analyzed under the Due Process Clause and its principles of fundamental fairness.[1] 524 U.S. at 539, 556, 118 S.Ct. 2131. That is the only relevant rule of law that comes from that decision. Thus, the court will not consider the Defendants' takings claim.

■ In addition, the fact that five justices ultimately struck down the "reachback" provision is not binding precedent. Only four justices agreed on the analytical method, the Takings Clause, in coming to

the unconstitutional conclusion. *Id.* at 537, 118 S.Ct. 2131. Of those five justices basing their analysis on the Due Process Clause, four upheld the Coal Act's constitutionality. *Id.* at 554, 118 S.Ct. 2131. Such a polarized opinion does not bind the inferior courts. *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170 (3rd Cir.1999). While the fact that four justices decided that the Coal Act is constitutional under the Due Process Clause might seem to provide the court with the ammunition that it needs to make this determination, the Fourth Circuit's position on this issue gives the court even greater direction.

In a case quite similar to the one at hand, *Holland v. Keenan Trucking Co.*, 102 F.3d 736 (4th Cir.1996), the Fourth Circuit could not have been more clear in its message to future due process challengers of the Coal Act. There, the court stated: "It is difficult to exaggerate the burden that appellants [the challengers of the Act] must overcome to carry the day on this argument [the due process challenge]."

■ In so concluding, the Fourth Circuit recounted the well-settled constitutional principles applicable to economic legislation. Legislation passed pursuant to the commerce power, like the Coal Act, carries a heavy presumption of validity. *Id.* at 740 (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). Accordingly, when an economic regulation reasonably addresses a legitimate legislative concern, judgments as to the wisdom of the law are "within the exclusive province of the legis-

---

1. The Supreme Court was sharply divided in *Eastern Enterprises*. The plurality, consisting of Justices O'Connor, Scalia, Thomas, and Chief Justice Rehnquist, relied upon the Takings Clause in deciding that the Coal Act, as applied to Eastern Enterprises, constituted a severely retroactive, legislative scheme that constituted an unconstitutional taking. 524 U.S. at 537, 118 S.Ct. 2131. Justice Kennedy concurred with the plurality opinion as to the unconstitutionality of the Act, but refused to coalesce in the analysis deferring instead to

an examination of the fairness of the Coal Act's application to Eastern Enterprises under the Due Process Clause. The dissenting justices, Breyer, Stevens, Souter, and Ginsburg, agreed with Justice Kennedy's use of a due process analysis, but disagreed in the result. These disparate positions among the justices produced but one rule of law, namely, that a challenge to the Coal Act's funding provisions must proceed under the Due Process Clause, and not as a Takings Clause examination.

lative and executive branches." *Id.* (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)).

 The heavy presumption of validity carries over to economic legislation that imposes a retroactive burden based on acts done in the past. *Id.* (citing *R.A. Gray & Co.,* 467 U.S. at 729, 104 S.Ct. 2709). Furthermore, this tenet controls despite the fact that the retroactive effect of the legislation might be "harsh and oppressive." *Id.* As observed by the Fourth Circuit, "harsh and oppressive" is simply shorthand for "arbitrary and irrational." *Id.* (citing *R.A. Gray & Co.,* 467 U.S. at 729, 104 S.Ct. 2709). Therefore, this court must uphold the Coal Act if its means [the funding provisions] will reasonably effectuate a legitimate result. Without a doubt, the Coal Act passes this minimal constitutional test. The Fourth Circuit's findings in *Keenan Trucking Co.* are persuasive to that end.

First, the legitimacy of the Coal Act's purpose cannot be disputed. *Id.* at 741. Labor unrest in the form of major coal strikes and the accompanying violence is all too familiar to this court. The economic impact of these strikes and the potential ramification of a fiscal failure of UMWA health benefit plans were giving rise to severe and far-reaching disruptions in local and interstate commerce. *Id.* Any attempt to alleviate such turmoil is unquestionably of legitimate legislative concern. *Id.*

Second, it was reasonable for Congress to extend the liabilities for funding the Coal Act to those "who have profited from the fruits of their [the retired miners] labor." *Id.* (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 18, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). Most conclusively, it was rational to place funding liability on NBCWA signatories because it was those agreements and the negotiations leading up to those agreements that, for the most part, created the expectations of lifetime benefits in mine workers. *Id.; see also District 29, UMWA v. UMWA 1974*

*Benefit Plan and Trust,* 826 F.2d 280, 282 (4th Cir.1987) (stating that the "intentions of the parties in providing for retirement health benefits was to guarantee their provision for life"). Quoting the Seventh Circuit, the Fourth Circuit opined that " 'it would be irrational to draw the line anywhere other than' NBCWA signatories." *Keenan Trucking Co.,* 102 F.3d at 741.

Simply put, these observations are fatal to the Defendants' constitutional claim. As stated previously, Pardee was a "me too" signatory to the 1978 NBCWA notwithstanding the semantic formula one might choose to employ in explaining its status under that agreement. Considering the burden placed upon a party when making a constitutional claim of the sort presented by this case, it is easy to see why Pardee's liability under the Act lives or dies by this "me too" designation. As a signatory operator, any assignment validly made under the Coal Act is constitutional as applied against Pardee and its sister companies insofar as they are "related persons" as discussed earlier in this opinion. As a result, the court need not consider the Defendants' severability argument.

## IV CONCLUSION

For reasons set forth above, the Plaintiffs' Motion for Summary Judgment is granted as it pertains to the Hess assignment and denied as to the Bolling and Brewer assignments. Accordingly, Defendants' Cross Motion for Summary Judgment is granted as it pertains to the Bolling and Brewer assignments.

The court holds as a matter of law that Pardee was a "me too" signatory to the 1978 NBCWA, that October 1, 1993 represents the final date for the SSA to have made assignments under the Coal Act, and that the Coal Industry Retirees Health Benefits Act of 1992 is constitutional as applied to Pardee and related persons. Judgment as to Plaintiffs' entitlement to fees and costs, if any, will await a determination of whether Pardee does, in fact, owe

money to the fund for the Hess assignment.