PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL H. HOLLAND, Trustee of
the United Mine Workers of
America Combined Benefit Fund;
MARTY D. HUDSON, Trustee of the
United Mine Workers of America
Combined Benefit Fund; ELLIOT A.
SEGAL, Trustee of the United Mine
Workers of America Combined
Benefit Fund; THOMAS O. S. RAND,
Trustee of the United Mine Workers
of America Combined Benefit
Fund; WILLIAM P. HOBGOOD, Trustee
of the United Mine Workers of
America Combined Benefit Fund;
GAIL R. WILENSKY, Trustee of the
United Mine Workers of America        No. 00-1770
Combined Benefit Fund; CARL E.
VAN HORN, Trustee of the United
Mine Workers of America
Combined Benefit Fund,
            *Plaintiffs-Appellants,*

                v.

PARDEE COAL COMPANY; HUMPHREYS
ENTERPRISES, INCORPORATED; RIVER
RESOURCES, INCORPORATED; GREATER
WISE, INCORPORATED; RED RIVER
COAL COMPANY, INCORPORATED,
            *Defendants-Appellees.*

UNITED STATES OF AMERICA,
            *Amicus Curiae.*

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(CA-98-110-A)

Argued: January 25, 2001

Decided: October 18, 2001

Before NIEMEYER and KING, Circuit Judges, and
Gerald Bruce LEE, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge King wrote the
majority opinion, in which Judge Lee joined. Judge Niemeyer wrote
a dissenting opinion.

## COUNSEL

**ARGUED:** Peter Buscemi, MORGAN, LEWIS & BOCKIUS, L.L.P.,
Washington, D.C., for Appellants. Jeffrey A. Clair, Civil Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Amicus Curiae. Mary Lou Smith, HOWE, ANDERSON &
STEYER, P.C., Washington, D.C., for Appellees. **ON BRIEF:** David
W. Allen, Office of the General Counsel, UMWA HEALTH &
RETIREMENT FUNDS, Washington, D.C.; John R. Mooney, MOO-
NEY, GREEN, GLEASON, BAKER, GIBSON & SAINDON, P.C.,
Washington, D.C., for Appellants. David W. Ogden, Assistant Attor-
ney General, Robert P. Crouch, Jr., United States Attorney, Mark B.
Stern, Civil Division, UNITED STATES DEPARTMENT OF JUS-
TICE, Washington, D.C., for Amicus Curiae. Daniel R. Bieger,
COPELAND, MOLINARY & BIEGER, P.C., Abingdon, Virginia,
for Appellees.

**OPINION**

KING, Circuit Judge:

This proceeding requires us to construe certain provisions of the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act" or "Act"), 26 U.S.C. §§ 9701-9722. Appellants, the Trustees ("Trustees") of the United Mine Workers of America Combined Benefit Fund ("Combined Fund"), brought this suit in the Western District of Virginia against Pardee Coal Company and four other current and former coal operators (collectively, "Pardee"). The Trustees seek to collect payment of health care premiums for which, they claim, Pardee is liable pursuant to the Coal Act.[1]

Pardee denied its liability for the health care premiums to the extent they arose from beneficiary assignments made by the Social Security Administration ("SSA") on or after October 1, 1993. The district court adopted Pardee's position, concluding, inter alia, that October 1, 1993, was a firm statutory deadline and that Pardee was not

---

[1]As explained more fully in Part I.A, *infra*, the Coal Act establishes a class of "signatory operators," consisting of coal operators that had been signatories to certain collective bargaining agreements. *See* 26 U.S.C. § 9701(c)(1). Section 9704(a) delineates the liability of "assigned operators," i.e., those signatory operators to whom liability for individual miners is assigned:

> Each assigned operator shall pay to the Combined Fund for each plan year beginning on or after February 1, 1993, an annual premium equal to the sum of the following three premiums—
>
> (1) the health benefit premium determined under subsection (b) for such plan year, plus
>
> (2) the death benefit premium determined under subsection (c) for such plan year, plus
>
> (3) the unassigned premium determined under subsection (d) for such plan year.
>
> Any related person with respect to an assigned operator shall be jointly and severally liable for any premium required to be paid by such operator.

26 U.S.C. § 9704(a).

liable for beneficiary assignments made after that date. *See Holland v. Pardee Coal Co.*, 93 F. Supp. 2d 706 (W.D. Va. 2000). Having carefully considered the Act and the relevant precedent, we find ourselves at odds with the district court's conclusion, and we accordingly reverse and remand.

I.

A.

Enacted in 1992, the Coal Act was designed to address and "remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans that provide health care benefits to retirees in the coal industry." 26 U.S.C.A. § 9701 (note) (West Supp. 2001).[2] Since 1947, medical and pension benefits for retired coal miners and their families have been provided through a series of multiemployer health plans established pursuant to successive collective bargaining agreements known as National Bituminous Coal Wage Agreements ("NBCWAs"). Beginning in 1951, the NBCWAs were negotiated by the United Mine Workers of America ("UMWA"), on behalf of coal miners, and the Bituminous Coal Operators' Association, Inc. ("BCOA"), on behalf of coal operators. Pursuant to the NBCWAs, a series of multiemployer trusts were established (collectively, the "Benefit Plans"), funded by per-ton royalties levied on the coal produced by contributing operators, providing for coverage of the nonpension benefits — including health care benefits — of both active and retired miners.[3]

---

[2]Although we include a brief chronology and explication of the Coal Act here, a more thorough account is provided in the Supreme Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 504-16 (1998) (holding that the Coal Act, as applied retroactively to corporations no longer participating in the coal industry, represents an unconstitutional taking). *See also Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1126-29 (4th Cir. 1996).

[3]More particularly, two Benefit Plans established thereunder are relevant to this proceeding. The 1950 Benefit Plan provided medical benefits to those miners who retired before January 1, 1976, and their dependents, while the 1974 Benefit Plan covered active miners and those retiring after 1975. *See Eastern Enters.*, 524 U.S. at 509.

Under the Benefit Plans, coverage was provided not only for retired employees of active coal operators, but also extended to "orphan" retirees, i.e., those retired miners whose employers had gone out of business or ceased contributing to the Benefit Plans.

The financial viability of the Benefit Plans became precarious as the cost of health care benefits escalated, coal production decreased, and coal operators steadily exited the industry. Coal operators rapidly abandoned the Benefit Plans, leaving an ever-diminishing group of coal operators "to absorb the increasing cost of covering retirees left behind by exiting employers." *See Eastern Enters. v. Apfel*, 524 U.S. 498, 511 (1998) ("A spiral soon developed, with the rising cost of participation leaving more employers to withdraw from the Benefit Plans, resulting in more onerous obligations for those that remained.").

This funding crisis culminated in 1989 in an eleven-month strike provoked by Pittston Coal Company's refusal to sign the 1988 NBCWA. Secretary of Labor Dole intervened in the dispute, establishing a bipartisan commission ("Coal Commission") to assess the Benefit Plans' financial status and to recommend "'a solution for ensuring that orphan retirees in the [Benefit Plans] will continue to receive promised medical care.'" *See id.* (quoting Coal Comm'n Report 2, App. (CA1) 1933). The Coal Commission observed that coal miners had, in their labor negotiations, "'traded lower pensions over the years for better health care benefits[,]'" *id.* (quoting Coal Comm'n Report, Executive Summary vii, App. (CA1) 1324), and thus were entitled to receive the promised benefits. While there was consensus that "'a statutory obligation to contribute to the plan should be imposed on current and former signatories to the [NBCWA],' the members of the Coal Commission disagreed about 'whether the entire [coal] industry should contribute to the resolution of the problem of orphan retirees.'" *See id.* (quoting Coal Comm'n Report, Executive Summary vii, App. (CA1) 1324).

By its enactment, the Coal Act merged the Benefit Plans into a new multiemployer plan, the Combined Fund, *see* 26 U.S.C. § 9702(a), which would provide "substantially the same" health benefits to retirees and their dependents as they were receiving under the Benefit Plans. *See* 26 U.S.C. § 9703(b). The Combined Fund's initial "plan

year" was the eight-month period from February 1, 1993, to September 30, 1993, with successive twelve-month plan years to begin on October 1 and end on September 30 of each year following. *See* 26 U.S.C. § 9702(c). The Act established an interim funding scheme for the first plan year, *see* 26 U.S.C. §§ 9704(i)(1)(A), 9705(a), after which time liability for individual retirees was assigned to specific coal operators according to the criteria set forth in 26 U.S.C. § 9706.

Under this "pay for your own" liability apportionment scheme, Congress required signatory operators (i.e., coal operators that had been signatories to NBCWAs) that were still "in business" and that had employed a particular beneficiary in the past to assume liability for the future medical benefits of that beneficiary. *See Pardee Coal*, 93 F. Supp. 2d at 712. Congress directed the SSA to, "before October 1, 1993," assign each eligible coal industry retiree to a signatory operator according to specified criteria, *see* 26 U.S.C. § 9706(a), anticipating that such assignments would serve as the basis for the Combined Fund's first premium assessments (i.e., for the second plan year beginning October 1, 1993).[4]

---

[4]Section 9706(a) establishes a uniform system of preference for assigning beneficiaries, as follows:

> [T]he Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:
>
> > (1) First, to the signatory operator which—
> >
> > > (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
> > >
> > > (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.
> >
> > (2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—
> >
> > > (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
> > >
> > > (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

The Act also provided financing for the health care benefits of "orphaned retirees," those retired miners whose employers had gone out of business and could not be assigned to any other party under the criteria set forth in 26 U.S.C. § 9706. To subsidize the health care costs of such unassigned beneficiaries, Congress authorized substantial contributions to the Combined Fund from the UMWA 1950 Pension Plan and from the Abandoned Mine Reclamation Fund ("AML Fund"), established under the Surface Mining Control and Reclamation Act of 1977. *See* 26 U.S.C. § 9705; 30 U.S.C. § 1231.

Specifically, on the first day of each of the Combined Fund's first three plan years, a $70 million transfer was to be made from the UMWA 1950 Pension Plan to the Combined Fund. *See* 26 U.S.C. § 9705(a). Thereafter, for the plan years beginning on and after October 1, 1995, Congress provided for annual transfers to the Combined Fund of up to $70 million in interest earned by the AML Fund; such transfers are solely dedicated to paying the health care premiums of unassigned beneficiaries. *See* 30 U.S.C. § 1232(h). To the extent that such transfers are inadequate to cover the expenditures on behalf of unassigned beneficiaries, the Act provides for the excess costs to be borne by assigned operators, according to their proportionate share of the assigned beneficiaries. *See* 26 U.S.C. §§ 9704(a)(3), 9704(d), & 9705(b)(2). To date, however, the transfers have proven sufficient, and assigned coal operators have been spared any responsibility for the premiums of unassigned beneficiaries.

### B.

Pursuant to its assignment authority under § 9706, the SSA determined that Pardee was a "signatory operator," and it assigned Pardee liability for the health care premiums of certain retired miners and their spouses. Retired miner Curtis Hess was assigned to Pardee on September 29, 1993, followed by Grover Bolling and Orvil Brewer

---

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

(and their spouses), on September 20, 1995, and September 22, 1997, respectively. Consistent with these assignments, the Combined Fund notified Pardee annually of its health care premium obligations, and, with each notification, requested payment of the premiums. Although Pardee made partial payments to the Combined Fund in the sum of $28,604.19 between October 1, 1993, and June 25, 1999, it denied liability for the premiums associated with the Bolling and Brewer assignments, which had been made after October 1, 1993. The Trustees maintained that such assignments were valid, and they filed suit in the Western District of Virginia to recover the outstanding balance of $57,498.43 allegedly owed by Pardee in delinquent payments.[5]

Pardee asserted, in response, that the Bolling and Brewer assignments were untimely and invalid, and, furthermore, it contended that the Coal Act contravened the Due Process and Takings Clauses of the Constitution. Accordingly, Pardee filed a counterclaim to recover payments already made to the Combined Fund pursuant to the September 29, 1993 assignment of Curtis Hess. Although Hess had been assigned to Pardee during the prescribed statutory period, Pardee renounced any liability for his benefits, based on its position that the Coal Act was unconstitutional.

Upon consideration of cross-motions for summary judgment, the district court held the Coal Act to be constitutional, ruling that, as a "signatory operator," Pardee was indeed "liable for any deficiency, or entitled to any excess, in payments pursuant to the [Hess] assignment." *Pardee Coal*, 93 F. Supp. 2d at 708. However, the district court further concluded that the Coal Act mandates the SSA to have made its assignments before October 1, 1993. Because they were made after that date, the assignments of Bolling and Brewer were ruled to be "void as a matter of law." *See id.* The Trustees timely appealed the summary judgment granted to Pardee on this point, and we exercise jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.[6]

---

[5]Additionally, the action initiated against Pardee by the Trustees sought accrued interest on the unpaid balance, liquidated damages, and attorneys' fees.

[6]The United States, as amicus curiae, submitted a brief and presented oral argument in support of the Trustees.

II.

This appeal presents an issue of statutory construction which, as a pure question of law, we review de novo. *United States v. Linney*, 134 F.3d 274, 282 (4th Cir. 1998). As such, we accord no deference to the district court's interpretation of the Coal Act.

III.

A.

The provisions of § 9706(a) include the specification that the SSA "shall" assign eligible beneficiaries to the proper coal operators "before October 1, 1993[.]" *See supra* note 4. The meaning and consequences of this section of the Coal Act constitutes the sole issue presented on appeal.

The district court, relying primarily on the Sixth Circuit's decision in *Dixie Fuel Company v. Commissioner of Social Security*, 171 F.3d 1052, 1062 (6th Cir. 1999), concluded that the Act unambiguously established October 1, 1993, as a jurisdictional mandate. *See Pardee Coal*, 93 F. Supp. 2d at 715-16.[7] It therefore accorded no deference to the contrary position adopted by the SSA, the agency empowered by Congress to administer the Act. *See id.* at 714 (citing *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984)); *see also Dixie Fuel*, 171 F.3d at 1064 ("Where the statute is clear, the agency has nothing to interpret and the court has no agency interpretation to which it may be required to defer. That is the case here."). We have arrived at the opposite conclusion: examined in accordance with the proper principles of construction, the Act clearly

---

[7]The Sixth Circuit is our only sister circuit to have addressed this issue. However, several district courts have considered the significance of the October 1, 1993 "deadline." *Compare Shenango Inc. v. Apfel*, No. 99-1035, *8 (W.D. Pa. July 25, 2000) (refusing to void assignments made after October 1, 1993), *and Five-J Energy, Inc. v. Apfel*, No. 97-172, *6 (N.D. W.Va. October 16, 1998) (same), *with King Knob Coal Co. v. Apfel*, No. 99-146, *12 (N.D. W.Va. September 29, 2000) (relying on the "clear and unambiguous language" of the Coal Act to conclude that "shall" constitutes a firm, jurisdictional deadline).

allows the SSA to exercise its assignment authority, including the authority to make new assignments, after October 1, 1993.[8]

### B.

As the district court emphasized, the word "shall," when used in a statutory context, is generally construed to be mandatory. *See Pardee Coal*, 93 F. Supp. 2d at 714 (citing *United States v. Monsanto*, 491 U.S. 600, 607 (1989)); *see also Dixie Fuel*, 171 F.3d at 1061-62 (citing cases). However, as the Supreme Court has pronounced, statutory provisions imposing a mandatory duty on an agency to act before a specific date are not generally construed to remove the agency's power to act after that date. *See, e.g.*, *Brock v. Pierce County*, 476 U.S. 253, 262 (1986); *see also United States v. Montalvo-Murillo*, 495 U.S. 711, 718 (1993) ("Although the duty is mandatory, the sanction for breach is not loss of all later powers to act."). In its *Brock* decision, the Supreme Court pronounced that a statutory provision that an agency "shall" perform certain functions within a prescribed period "does not, standing alone, divest the [agency] of jurisdiction to act after that time." 476 U.S. at 266. The Court expressed its reluctance to view "every failure of an agency to observe a procedural requirement [as] void[ing] subsequent agency action, especially when important public rights are at stake." *Id.* at 260.

In applying *Brock* — that is, in determining when a statutory "deadline" is jurisdictional, rather then procedural — our circuit precedent is illuminating:

> [W]here a statutory deadline requiring that the government "shall" take certain action within a particular time frame

---

[8]In determining whether *Chevron* deference is warranted, the first question is always whether Congress has directly spoken to the issue. *See* 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Since we can divine a clear congressional intent, the issue of *Chevron* deference does not apply. However, if deference were warranted, it would have no impact on the resolution of this case, because the SSA's position is also the construction clearly intended by Congress.

fails to specify the consequences of the government's failure to comply with that deadline, courts should not assume from the statute's mandatory language itself that a jurisdictional requirement was intended, if a remedy for the government's noncompliance less drastic than dismissal is available. Rather, in such a context, they should examine the "normal indicia of congressional intent," to determine whether Congress meant the provision to be jurisdictional.

*United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1344 (4th Cir. 1994) (citations omitted). Although the Court in *Brock* refused to hold that "a statutory deadline for agency action can never bar later action unless that consequence is stated explicitly in the statute[,]" 476 U.S. at 262 n.9, it is well-settled that, where such a consequence is not specified, "the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993).

Pardee suggests that *Brock* represents a narrow "public interest" exception to a general rule that "shall" is mandatory; here, Pardee urges, the public interest is not sufficiently compromised to warrant invoking the exception. *See* Appellees' Br., at 15. However, Pardee's position distorts the applicable precedent. The *Brock* "exception" is a recognized canon of construction which instructs against treating statutory timing provisions as jurisdictional, unless such a consequence is clearly indicated. *See, e.g., Hendrickson v. FDIC*, 113 F.3d 98, 101 (7th Cir. 1997) ("Standing alone, moreover, use of the word 'shall' in connection with a statutory timing requirement has not been sufficient to overcome the presumption that such a deadline implies no sanction for an agency's failure to heed it."); *In re Siggers*, 132 F.3d 333, 336 (6th Cir. 1997) ("The law is well-established in this and other jurisdictions "that '[a] statutory time period is not mandatory unless it *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision.") (emphasis in original); *see also* 3 Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 57.19 (5th ed. rev. & Supp. 2001) ("The general rule is that if a provision of a statute states a time for performance of an official duty, without any language denying performance after a specified time, it is directory [rather than jurisdictional].").

Thus, our task is to examine the text of the Coal Act and the context in which it was enacted to determine whether Congress plainly established October 1, 1993, as a firm jurisdictional deadline. More specifically, we must discern whether Congress anticipated and intended that otherwise-valid assignments made after that date would be void — even if that meant that beneficiaries who could be assigned to specific operators would, on account of administrative inefficiency or understaffing,[9] be relegated to the unassigned beneficiary pool.

For the reasons explained herein, we conclude that neither the text nor the legislative history of the Coal Act reflects a clear congressional intent to extinguish the SSA's authority to assign beneficiaries after October 1, 1993. Established precedent militates against treating this "deadline" as jurisdictional. Moreover, to construe § 9706(a) as jurisdictional, as the district court did, would do violence to Congress's goal of ensuring that funding obligations be allocated to specific coal operators according to their actual, individual liability. Such a result also frustrates congressional intent by shifting financial obligations properly borne by private parties to the public fisc.[10]

[9]Although the SSA was presented with the truly formidable task of assigning approximately 65,000 miners to their respective operators by October 1, 1993, *see* J.A. 88, no funds were appropriated for the task until July 2, 1993, *see id.* at 105. To assign those miners, the agency had to search each miner's records and reconstruct his employment history, and then match that history against the lists of signatory coal operators. *See id.* at 89. After the initial assignments had been made, the SSA embarked upon an extensive review process. In a statement to the House Ways and Means Committee (Subcommittee on Oversight), SSA Principal Deputy Commissioner Lawrence H. Thompson reported that as of June 22, 1995, the agency had received requests for review from 471 coal operators concerning assignments for 24,541 miners. *See id.* at 96.

[10]Pardee suggests that our decision in *Sigmon Coal Company v. Apfel*, 226 F.3d 291 (4th Cir. 2000), *cert. granted sub nom. Massanari v. Sigmon Coal Co., Inc.*, 121 S.Ct. 1652 (Apr. 23, 2001), precludes us from consulting the Act's legislative history in this situation. *See* Appellees' Br., at 16-17. To support this contention, it directs our attention to a recent decision in which the district court, relying on *Sigmon Coal*, speculated that we would "look no further than the clear and unambiguous language of the statute itself to conclude that the deadline of October 1, 1993[,] is a statutory deadline[.]" *See King Knob*, *supra* note 7.

1.

In conducting our textual analysis of the Coal Act, we are struck by the absence of any discussion of the consequences of the SSA's failure to complete its beneficiary assignments by October 1, 1993. The Act does not characterize untimely assignments as invalid, nor does it require that beneficiaries assigned after September 30, 1993, be placed into the unassigned beneficiary pool and remain forever unassigned. The Coal Act, in short, is entirely devoid of any provision that expressly divests the SSA of its authority to make adjustments or additions to the assigned and unassigned beneficiary pools in light of changed circumstances or newly obtained information.

These omissions are particularly salient in this case, given that the Supreme Court rendered its *Brock* decision in 1986, six years before enactment of the Coal Act. Congress is therefore presumed to have known that its directive that the SSA "shall" make assignments before October 1, 1993, would not be construed as depriving the agency of its authority to act after that date. *See, e.g.*, *United States v. Wells*, 519 U.S. 482, 495 (1997) ("[W]e presume that Congress expects its statutes to be read in conformity with this Court's precedents[.]"). Had Congress intended to establish a jurisdictional bar to later assignments, it could have easily specified a consequence for the SSA's failure to comply with the statutory deadline. *See Brock*, 476 U.S. at 260 ("[C]ourts should not assume that Congress intended the agency to lose its power to act."). As Judge Luttig observed in *Becton Dickinson*, the presence of the term "shall" is insufficient textual evidence to establish that Congress intended such a provision to be jurisdictional. *See* 21 F.3d at 1344.[11]

Although, as *Sigmon Coal* observes, courts generally should not resort to legislative history if a statute's language is unambiguous, this is not such a case. While the meaning of § 9706(a) can be clearly ascertained through the use of traditional canons of construction, *see infra* Part III.B, its meaning cannot be derived from that section's literal language.

[11]Our *Becton Dickinson* decision went on to provide examples of language that would be sufficient to divest an agency of its jurisdiction. *See* 21 F.3d at 1344 (citing 28 U.S.C. § 2415(a), specifying that "every action for money damages brought by the United States . . . which is founded

Echoing the Sixth Circuit's decision in *Dixie Fuel*, Pardee now contends that the consequences of delayed assignment are implicit in the statute as a whole. According to Pardee, the Act contemplates that the allocation of liability among the coal operators would be determined on the basis of pre-October 1, 1993 assignments, "connect[ing] funding and premium calculations to the status of assignments as of October 1, 1993." Appellees' Br., at 13 (citing 26 U.S.C. § 9704(f)). Thus, asserts Pardee, "[a]bsent a specific figure representing the number of unassigned beneficiaries, the statutory scheme as a whole would be undermined." Appellees' Br., at 13-14.

Pardee's assertion in this regard is erroneous. Although § 9706(a) quite clearly directs the SSA to assign beneficiaries prior to October 1, 1993, the statutory scheme contemplates much more fluidity in assignments than Pardee acknowledges. Pardee emphasizes the interest in certainty, i.e., the interest in finalizing the allocation of liability among assigned operators, permitting them to know and rely upon their funding obligations. *See* Appellees' Br., at 24 ("Liabilities would be ascertainable in both the short and long terms, thereby freeing future transactions from the burden of unforeseeable events involving 'new' assignments coming from SSA at any point.").

Importantly, however, the Act appears to subordinate the coal operators' interest, if any, in finalizing assignments by October 1, 1993, to the overriding interest in ensuring that such assignments are fair and accurate. Pursuant to § 9706(f), an assigned operator may request from the SSA Commissioner detailed information on the work history of any beneficiary assigned to that operator, and, if the operator believes the assignment to be incorrect, it may request review of the assignment. While such requests must be submitted to the Commissioner within specified time parameters,[12] the Act does not impose

---

upon any contract . . . *shall be barred* unless the complaint is filed within six years," and 28 U.S.C. § 2415(b), specifying that "every action for money damages brought by the United States . . . which is founded upon a tort *shall be barred* unless the complaint is filed within three years . . .") (emphasis in original).

[12]An assigned operator may, within 30 days of receiving notice with respect to a particular beneficiary, request information as to his work history. *See* 26 U.S.C. § 9706(f)(1). After receiving such information, the assigned operator has an additional 30 days in which to request review of the assignment. *See* 26 U.S.C. § 9706(f)(2).

any parallel time constraints on the SSA's review process. The Act leaves such assignments — and thus, the allocation of proportionate liability — open indefinitely, subject to review and revision by the SSA. In light of these appeal provisions, Congress manifestly expected that beneficiary reassignments would be made after October 1, 1993, with the liability of assigned operators to be reapportioned commensurately.

Indeed, as the Trustees point out, "[t]he number of unassigned beneficiaries has been changed on numerous occasions throughout the history of the Combined Fund, and the statute expressly contemplates that possibility." Appellants' Reply Br., at 9. In addition to its appeal provisions, § 9706(f) provides for beneficiary reassignment if and when an assigned operator is no longer "in business," and when there are no related persons who may assume the operator's obligations. *See* 26 U.S.C. § 9706(f)(2)(B). In order to deal with such adjustments, the Combined Fund uses an accounting method called "inception billing," which annually adjusts for the retroactive effects of adjusted beneficiary assignments. Thus, the Coal Act expressly provides that each operator's premium assessment will be recalculated at the beginning of every new plan year to reflect adjustments made to the beneficiary assignments. *See* 26 U.S.C. § 9704(f)(2).[13] These annual

---

[13]Section 9704(f) provides as follows:

For purposes of this section—

> (1) In general.— The term "applicable percentage" means, with respect to any assigned operator, the percentage determined by dividing the number of eligible beneficiaries assigned under Section 9706 to such operator by the total number of eligible beneficiaries assigned under Section 9706 to all such operators (determined on the basis of assignments as of October 1, 1993).

> (2) Annual adjustments.— In the case of any plan year beginning on or after October 1, 1994, the applicable percentage for any assigned operator shall be redetermined under paragraph (1) by making the following changes to the assignment as of October 1, 1993:

> > (A) Such assignments shall be modified to reflect any changes during the period beginning October 1, 1993, and

readjustments, mandated by the Act itself, would be antithetical to a statutory scheme designed, as Pardee maintains, to "fix" liability as of October 1, 1993.[14]

Put simply, nothing in the appeals provisions (§ 9706(f)) of the Act indicates that the SSA's authority to make revised assignments constitutes an exception to a general divestiture of authority as of October 1, 1993. Moreover, our adoption of such a construction would create irrational distinctions in the SSA's power to reevaluate its initial assignments. If an administrative review revealed that an assignment was based on a factual error, a misreading of the statute, or a simple mistake, the SSA could, under § 9706(f)(3)(A), reassign the beneficiary according to the criteria set forth in § 9706(a). However, under the district court's ruling, if the SSA erroneously concluded that a

---

> ending on the last day of the preceding plan year pursuant to the appeals process under section 9706(f).
>
> (B) The total number of assigned eligible beneficiaries shall be reduced by the eligible beneficiaries of assigned operators which (and all related persons with respect to which) had ceased business (within the meaning of section 9701(c)(6)) during the period described in subparagraph (A)).

[14]Concededly, the Act provides for adjustments necessitated when an operator successfully appeals an assignment or exits the coal industry, but never directly addresses the possibility that new assignments would be made on or after October 1, 1993. *See Dixie Fuel*, 171 F.3d at 1062. We believe, however, that the authority to make new assignments is implied by the flexibility of the statutory scheme. Had Congress wished to frame the adjustment provisions of § 9706(f) as exceptions to a general rule barring assignments after October 1, 1993, it could have done so, by simply employing one of several common conventions of statutory drafting. For example, it could have mandated that all assignments shall be made by October 1, 1993, "except as provided" in the appeal provisions of § 9706(f). *See, e.g.*, *Acosta v. Louisiana Dept. of Health and Human Resources*, 478 U.S. 251, 254 (1986). Alternatively, Congress could have explicitly allowed the SSA to make new assignments after an administrative appeal, "notwithstanding" the deadline set forth in § 9706(a). *See, e.g.*, *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416-17 & n.4 (D.C. Cir. 1991).

beneficiary was unassignable, but later (i.e., on or after October 1, 1993) received information connecting the beneficiary to an extant employer, the SSA would lack authority to make the appropriate assignment. In effect, Pardee's position, and the district court's ruling, would allow the SSA to reassign those beneficiaries who were initially assigned to the wrong operator, yet forbid the "reassignment" of beneficiaries who were initially assigned to no operator. We cannot accept that Congress intended the allocation of liability to rest on such a hollow distinction.[15]

2.

Since a congressional intent to establish October 1, 1993, as a jurisdictional deadline cannot be divined from the text of the Coal Act, we must proceed to an analysis of "other indicia of congressional intent." *See Becton Dickinson*, 21 F.3d at 1344. Therefore, as in *Becton Dickinson*, we must examine the Coal Act's legislative history to determine whether Congress meant for the provision in question to be viewed as a jurisdictional requirement. *Id.* at 1344 n.5.[16]

---

[15]Indeed, depriving the SSA of its power to make beneficiary assignments on or after October 1, 1993, would have presented the agency with a perverse incentive to make a timely "rough cut," and then refine its assignments through the administrative review process.

[16]In *Becton Dickinson*, we registered some doubt as to whether courts should "resort to legislative history where Congress has not specified the consequence" of the agency's failure to meet a statutory deadline. *See* 21 F.3d at 1344 n.5. In its *Brock* decision, the Supreme Court looked to legislative history as among the relevant indicia of congressional intent. *See Brock*, 476 U.S. at 263-65. Some circuit courts, though, have treated the absence of a specified consequence in the statutory text as dispositive of congressional intent, *see Becton Dickinson*, 21 F.3d at 1344 n.5 (citing as example *St. Regis Mohawk Tribe, New York v. Brock*, 769 F.2d 37, 41 (2d Cir. 1985)), and the Supreme Court has at times invoked such language approvingly. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 63-64 (1993) (citing *Brock* and *St. Regis Mohawk Tribe* for the proposition "if a statute does not specify a consequence for noncompliance . . ., the federal courts will not in the ordinary course impose their own coercive sanction"). That said, the Supreme Court has never squarely adopted the position that jurisdictional consequences must be expressly stated — and, in fact, has expressly declined to do so. *See Brock*, 476 U.S. at 262 n.9 ("We need not, and do not, hold that a statutory deadline for agency action can never bar later action unless that consequence is stated explicitly in the statute.").

As we have noted, Congress enacted the Coal Act in 1992 to ensure the long-term viability of the Benefit Plans, the funding of which had become precarious. The Act was predicated on Congress's express finding that:

> in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

26 U.S.C.A. § 9701 (note) (West Supp. 2001). Consistent with Congress's objective of "identify[ing] persons most responsible for plan liabilities," *see id.*, the legislative history of the Coal Act reflects an effort to "insure that every reasonable effort is made to locate a responsible party to provide the benefits before the costs are passed to other signatory companies which have never had any connection to the individual[.]" 138 Cong. Rec. S17604 (daily ed. Oct. 8, 1992). To this end, the Conference Committee Report declared that the Act's "overriding purpose is to find and designate a specific obligor for as many beneficiaries in the [Benefit] Plans as possible." *Id.* The conferees further stated their "inten[tion] that the largest possible number of beneficiaries in the [Benefit] Plans be assigned to a specific or designated company[,]" and "that the number of unassigned beneficiaries is kept to an absolute minimum." *Id.* at S17605.

Although the legislative history indicates that October 1, 1993, was the date by which "assigned operator allocations . . . are required to be made," *see id.* at S17605, the paucity of references to this "deadline" is conspicuous and compelling. Equally conspicuous is the absence of any mention of beneficiaries who could be assigned according to the criteria contained in § 9706, but whose assignments might not be completed on a timely basis. We regard as especially revealing the explanation given for why certain beneficiaries would remain unassigned:

> *As a practical matter, not all beneficiaries can be assigned* to a specific last signatory operator, related person or assigned operator for payment purposes. *This is because in*

*some instances, none of those persons remain in business*, even as defined to include non-mining related businesses . . . .

*Id.* (emphasis added). Elsewhere, the Conference Report frames the calculation of unassigned beneficiary premiums as a function of "the number of beneficiaries *assignable* to each operator as of October 1, 1993[,]" *id.* (emphasis added), or as the "beneficiaries in the Combined Fund who *can be assigned* to an operator (or related person) still in business[.]" *Id.* It is obvious from such statements that Congress expected the unassigned beneficiary pool to consist exclusively of "orphans" — eligible beneficiaries who had been abandoned by their former employers. The position of Pardee, however, would cause the unassigned pool to be filled with assignable beneficiaries, "orphaned," as it were, by administrative delay.[17]

Our examination of the Coal Act's legislative history convinces us that Congress intended the status of individual beneficiaries to depend not on the vicissitudes of bureaucratic action, but instead on the merits, i.e., whether an extant operator could be identified and held responsible. It is apparent that a central objective of the Act is to assign retired coal miners and their dependents to their respective employers whenever such a match is possible, and to allocate liability accordingly. This legislative objective corresponds closely to the Act's genesis and policy underpinnings — and, crucially, to its funding scheme.

It must be recalled that the Act represents a legislative effort to sta-

---

[17]The Sixth Circuit, in its *Dixie Fuel* decision, characterized the Conference Report as "confirm[ing] the intent of Congress" to establish October 1, 1993, as a jurisdictional deadline. *See Dixie Fuel*, 171 F.3d at 1064. While it is true that the Coal Act — and the Conference Report preceding its enactment — calculates the premiums owed by individual operators on the basis of October 1, 1993 assignments, it is also clear that Congress expected such initial assignments to be revised and the premiums recalculated from time to time. *See* Part III.B.1, *supra*. In its examination of the Act's legislative history, *see* 171 F.3d at 1063-64, the Sixth Circuit failed to reconcile the extensive review and reassignment process with the notion that liability be fixed as of October 1, 1993.

bilize funding of a private health care benefit plan. *See* 26 U.S.C.A. § 9701 (note) (West Supp. 2001) (the Act was enacted "to provide for the continuation of a *privately financed self-sufficient program* for the delivery of health care benefits to the beneficiaries of [the Benefit Plans.]") (emphasis added). The funding implications of the district court's decision and the position maintained by Pardee are significant. *Brock* indicated that it should not be presumed that Congress intended statutory deadlines to bar agency action to the detriment of the public fisc. *See* 476 U.S. at 260-61 (refusing to strip agency of its authority to act after the statutory deadline where "public rights are at stake" and agency delay "would prejudice the rights of the taxpaying public"). However, operators such as Pardee may avoid liability for individual beneficiaries — and thus enjoy a proportionate reduction in their contributions for unassigned beneficiaries — simply because some assignments were "untimely." This results in a financial windfall to certain coal operators, at the expense of other operators (whose assignments were completed before October 1, 1993), and, more importantly, the public interest.

While premiums for the assigned beneficiaries are paid entirely by coal operators, the premiums for the unassigned beneficiary pool are funded by an initial transfer of $210 million from the 1950 UMWA Pension Plan to the Combined Fund, followed, in the plan year beginning October 1, 1995, by annual transfers of up to $70 million earned in interest on the balance of the AML Fund. *See* 26 U.S.C. §§ 9704(b), 9705.[18] In the event that such transfers are insufficient to fund the premiums for unassigned beneficiaries, the Coal Act also provides for the assessment of additional contributions from the signatory operators and related persons, based on each operator's proportionate share of all assigned beneficiaries. *See* 26 U.S.C. § 9704(d) & (f).

---

[18]Established under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1231(a), the AML Fund is financed by fees collected on each ton of coal sold, used, or transferred in the United States. With the exception of annual appropriations to the Combined Fund to defray the costs associated with orphan retiree benefits, the AML Fund is dedicated to restoring abandoned and inadequately reclaimed mining areas. *See* 30 U.S.C. §§ 1232, 1233.

To date, transfers of public monies from the AML Fund have been adequate to cover the unassigned beneficiary premiums, obviating the need to exact pro rata contributions from the assigned coal operators. Indeed, as of November 30, 2000, over $336 million had been transferred from the AML Fund to the Combined Fund to subsidize the health care premiums of unassigned beneficiaries. *See* Declaration of Robert J. Ewing, Asst. Dir. of Finance and Administration for the Office of Surface Mining Reclamation and Enforcement (Dec. 21, 2000). While such transfers are explicitly authorized under the Act, they also represent funds diverted from the important public purpose of reclamation projects to rectify the serious threats posed to public health and safety by abandoned coal mines.[19] Congress could not and did not intend the AML Fund interest to be unnecessarily depleted on account of simple administrative delay by the SSA. To excuse the financial obligations of coal operators, where liability is both identifiable and identified, would frustrate the text, purpose, and legislative history of the Act.

## IV.

Having analyzed both the text and legislative history of the Coal Act, we are unable to discern a clear congressional intent to establish October 1, 1993, as a jurisdictional deadline, rendering void all beneficiary assignments made by the SSA after that date. In this case, well-settled principles of statutory construction militate against regarding the timing provision in § 9706(a) as jurisdictional.

---

[19]The magnitude of the nation's reclamation needs is alarming. It is estimated that over $2.6 billion of coal-related health, safety, property and general welfare problems remain to be rectified, including "nearly 730 miles of dangerous, unstable man-made cliffs ("highwalls"), 5,200 portals and vertical openings, 10,000 acres of dangerous piles and embankments, over 7,200 acres of subsidence problems, and over 2,400 pieces of hazardous equipment and facilities." *See* Testimony of Kathy Karpan, Dir. of the Office of Surface Mining, Before the Senate Committee on Government Affairs (Subcommittee on Oversight, Restructuring and the District of Columbia) (Oct. 6, 1998). Additionally, over 8,000 miles of streams have been damaged by acid mine drainage, killing fish and wildlife and threatening the potable water supply of numerous communities (especially in Appalachia). *See id.*

We accordingly reverse the district court insofar as it invalidated the Bolling and Brewer assignments, and we remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

The Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. § 9701 *et seq.*, requires "signatory operators" to pay to the United Mine Workers of America Combined Benefit Fund (the "Combined Fund") specified healthcare premiums for retired coal miners who have been "assigned" to the signatory operators by the Commissioner of Social Security. *See id.* § 9704. The amount of premiums payable by a signatory operator is fixed by the number of retirees assigned to the signatory operator under § 9706. *See id.* § 9704(b)(1). And section 9706(a) provides, in relevant part, that the Commissioner of Social Security "*shall, before October 1, 1993, assign* each coal industry retiree who is an eligible beneficiary to a signatory operator." (Emphasis added). If not so assigned, the retirees must nevertheless be paid benefits by the Combined Fund from its funds. *See id.* § 9703.

In this case, the Commissioner of Social Security purported to assign retired miners Grover Bolling and Orvil Brewer to Pardee Coal Company roughly two years and four years, respectively, after the deadline for assignments imposed by Congress. Bolling was assigned to Pardee on September 20, 1995, and Brewer, on September 22, 1997. Pardee refused to pay these retirees' premiums because the retirees' assignment to Pardee was untimely. The district court agreed with Pardee, and I would affirm.

Because these assignments did not comply with the statutory deadline imposed by the Coal Act for the assignment of retirees to signatory operators, the assignments may not be charged to the signatory operator. *See Dixie Fuel Co. v. Comm'r of Soc. Sec.*, 171 F.3d 1052, 1063-64 (6th Cir. 1999). The Sixth Circuit in *Dixie Fuel*, after explaining why the statutory deadline is important to the calculation of the obligations of every signatory operator, concluded that the courts were not free to ignore Congress' deadline. The court stated:

By specifying in the statute that "the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree . . . to a signatory operator," and by resting the entire scheme for calculation of premiums of the assignments made as of that date, Congress did speak directly and unambiguously on the issue of when the Commissioner's authority to make those assignments expired. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."

171 F.3d at 1063 (quoting *Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).

The majority opinion seeks to adjust the financial equities of the Coal Act by judicial mandate, and in doing so, it ignores the statutory deadline unambiguously stated by Congress in the Act. In addition, this approach creates an unnecessary circuit split with the Sixth Circuit's decision in *Dixie Fuel*. Because I agree with *Dixie Fuel*'s conclusion that we must follow the plain, unambiguous language of the Coal Act, I respectfully dissent.